IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

LIONEL LEE PRINCE,                    *

    Plaintiff,                         *

v.                                    *              Civil Action No. GLR-23-875

OFFICER A. CRABTREE, et al.,          *

    Defendants.                        *

***

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants Warden Ronald S. Weber[1] and Officer A. Crabtree's (collectively, "Defendants") Motion to Dismiss, or in the Alternative, for Summary Judgment. (ECF No. 32). The Motion is ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2023). For the reasons set forth below, the Court will grant the Motion.

## I.      BACKGROUND

### A.      Plaintiff's Allegations[2]

Self-represented Plaintiff Lionel Lee Prince alleges that on May 13, 2022, around 5:30 p.m., on Housing Unit 2D at Western Correctional Institution ("WCI"), a cell "filled up with hazardous bodily waste." (Statement of Claim at 1, ECF No. 1-2). He alleges that Defendant Officer A. Crabtree failed to provide "protective gear" and failed to follow

---

[1] The Clerk will be directed to correct Weber's name in the docket.

[2] Unless otherwise noted, the Court takes the following facts from the Complaint (ECF No. 1) and accepts them as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007).

procedures and policies in place at WCI when Prince was cleaning the tier. (Id.). Prince had no training in cleaning "water contaminated with hazardous human urine and fecal matter" as a result of the drain backing up. (Id.). He adds that this occurred "right after food was served." (Id.).

Prince faults Warden Ronald S. Weber for failing to investigate his Administrative Remedy Procedure Complaint ("ARP") when Webb was told a "lie" that all volunteers for the clean-up were given yellow rubber gloves and cleaning solution. (Id.). Prince recalls that the "fecal matter smelled so bad the nurse refuse[d to] pass out the medication" until around 1:10 a.m. and that he did not stop cleaning the tier until around 2:00 a.m. (Id.).

Officers Colespring and Holster told the inmates who were cleaning that maintenance was called at 6:10 p.m., but Prince maintains this was also a lie and is evidence that the officers present showed a deliberate disregard for his safety. (Id.). Prince believes that maintenance was not called until 2:00 a.m. (Id.). The medical department gave him some medication because his feet broke out after he performed the clean-up, but he was not given a blood test. (Id.). He further claims that medical staff refused to give him a blood test for exposure to human waste. (Id.).

In his Supplemental Complaint, Prince says that he "had no choice but to spend more than five hours cleaning up that waste" and maintains he was not given any protective gear to wear while doing the clean-up. (Suppl. Compl. at 4, ECF No. 8). Prince adds that he "had to smell human waste on [his] belonging[s]" and had to "eat food with contaminated water" on his person and his clothing. (Id. at 5).

Prince needed "long-term medical treatment" for a "long-lasting headache," and he wants "blood work done." (Id.). He claims that his foot broke out with a rash and that he lost personal property because it became contaminated. (Id.). He seeks $80,000 in monetary damages. (Id.).

**B.    Defendants' Response**[3]

Defendants assert that Prince did not complete the administrative remedy process and his claim is therefore subject to dismissal. (Mem. Supp. Mot. Dismiss Mot. Summ. J. ["Mot."] at 4–5, ECF No. 32-1). Prince filed an ARP with the Warden on May 14, 2022, one day after the incident. (See id. at 1, 3; ARP Rs. at 1, ECF No. 32-2). After an investigation, the ARP was dismissed because Prince volunteered to clean-up, he was provided yellow rubber gloves, and he presented no damaged clothing for replacement. (ARP Rs. at 2, 4–7).

On May 16, 2022, Prince appealed the Warden's response to the Commissioner of Correction. (ECF No. 32-3). On July 19, 2022, the Commissioner dismissed the appeal because the "investigation revealed that [Prince] volunteered to assist with the cleanup of the tier when a drain backed up." (May 16, 2022 Appeal Rs. at 11, ECF No. 32-3). The Commissioner's response noted that "all volunteers were given yellow rubber gloves and cleaning solution" before the clean-up process began. (Id.).

---

[3] Citations to the page numbers of the documents referenced in Section II.B refer to the pagination assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system.

Prince filed an appeal of the Commissioner's response to the Inmate Grievance Office ("IGO"), and a case was opened in that office on December 27, 2022 and assigned case number IGO 20221464. (Decl. Robin Woolford ["Woolford Decl."] ¶ 3, ECF No. 32-4). After it was determined that Prince was appealing the Warden's ARP response, the IGO determined that his appeal could not be processed because he failed to provide all of the necessary paperwork regarding the ARP. (Id. ¶ 5). The IGO sent a letter to Prince on January 18, 2023, advising him that he must provide a copy of all missing materials or explain why he failed to do so within thirty days. (Id. ¶¶ 5–6; Jan 18, 2023 Letter at 4, ECF No. 32-4). He was further advised that if he did not respond to the letter, his appeal would be dismissed without further notice. (Woolford Decl. ¶¶ 5–6; Jan 18, 2023 Letter at 4).

On February 9, 2023, Prince responded to the IGO's letter. (Woolford Decl. ¶ 7). He did not, however, provide all of the missing paperwork, which included: his complaint to the Warden, a receipt from the Warden, the Warden's response, the appeal to the Commissioner, any receipt from the Commissioner, and the Commissioner's response. (Id. ¶¶ 5–7; see also January 18, 2023 Letter at 4–5). Despite his failure to comply with the instructions given in the January 18, 2023 Letter, Prince's IGO case was not dismissed. (See Feb. 28, 2023 Letter at 6, ECF No. 32-4). Rather, he was granted another thirty days from February 28, 2023 to provide a complete response. (Id.; Woolford Decl. ¶¶ 8–9). After more than 30 days passed with no response from Prince, his appeal was dismissed on April 17, 2023. (Woolford Decl. ¶ 10).

Defendants also provide medical records in support of their Motion which indicate that Prince complained only of stomach pain and a persistent headache in a sick call slip

4

written two days after the clean-up occurred. (Medical Rs. Part 1 at 1–2, ECF No. 32-5). In response to those complaints, Prince was given Tylenol for his headache. (Id.). He did not request treatment for a rash, nor did he request a blood test. (Id.).

A medical provider saw Prince for complaints of a headache on October 27, 2022 and prescribed him Excedrin for his headache. (Medical Rs. Part 2 at 1–2, 3, ECF No. 32-6). At that time, the only other complaints from Prince presented were chronic testicular pain and seasonal allergies. (Id. at 2). Prince's chronic testicular pain is due to a surgical procedure in 2014. (Id. at 1).

In December 2022, Prince requested a blood test for the first time. (Medical Rs. Part 3 at 2, ECF No. 32-7). Prince received a blood test on December 19, 2022. (Id. at 1).

On May 16, 2023, Prince expressed concern about being exposed to human waste and fear that he may have contracted an infectious disease. (Medical Rs. Part 5 at 1, ECF No. 32-9). He was given a rapid HIV and Hepatitis C test, both of which were negative. (Id.).

Contrary to Prince's allegation that maintenance was not called until five hours after the back-up occurred, Defendants provide a copy of the "Daily Significant Events Log" for WCI on May 13, 2022. (Events Log at 2, ECF No. 36-10). According to the Log, maintenance was called at 6:00 p.m. and again at 10:00pm to address the drainage malfunction. (Id.). During the second call, Maintenance Officer Mike Iser advised that there were no maintenance staff available to address the issue. (Id.). At 11:00 p.m., Iser contacted the officer on duty on the tier to advise that a maintenance officer was sent to the housing unit to address the problem with the drain. (Id.).

5

## II.   DISCUSSION

### A.   <u>Conversion</u>

Defendants' Motion is styled as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment under Federal Rule of Civil Procedure 56.  A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  <u>See</u> <u>Kensington Vol. Fire Dep't, Inc. v. Montgomery Cnty.</u>, 788 F.Supp.2d 431, 436–37 (D.Md. 2011), <u>aff'd</u>, 684 F.3d 462 (4th Cir. 2012).  This Rule provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d).  The Court "has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'"  <u>Wells-Bey v. Kopp</u>, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and a reasonable opportunity for discovery.  <u>See</u> <u>Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt.</u>, 721 F.3d 264, 281 (4th Cir. 2013).  When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. <u>See</u> <u>Moret v. Harvey</u>, 381 F.Supp.2d 458, 464

(D.Md. 2005) (citing Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 260–61 (4th Cir. 1998)).

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011). Yet, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). To raise sufficiently the issue that more discovery is needed, the non-movant must typically file an affidavit or declaration under Rule 56(d), explaining the "specified reasons" why "it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d).

"The Fourth Circuit places 'great weight' on the affidavit requirement." Nautilus Ins. Co. v. REMAC Am., Inc., 956 F.Supp.2d 674, 683 (D.Md. 2013) (quoting Evans, 80 F.3d at 961). However, non-compliance may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary." Harrods, 302 F.3d at 244. Courts place greater weight on the need for discovery "when the relevant facts are exclusively in the control of the opposing party," such as "complex factual questions about intent and motive." Id. (quoting 10B Wright, Miller & Kane, Federal Practice & Procedure § 2741, at 419 (3d ed. 1998)) (internal quotation marks omitted).

7

Nonetheless, a Rule 56(d) affidavit is inadequate if it simply demands "discovery for the sake of discovery."  Hamilton v. Mayor of Balt., 807 F.Supp.2d 331, 342 (D.Md. 2011) (citation omitted).  A Rule 56(d) request for discovery is properly denied when "the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment."  Ingle ex rel. Estate of Ingle v. Yelton, 439 F.3d 191, 195 (4th Cir. 2006) (quoting Strag v. Bd. of Trs., Craven Cmty. Coll., 55 F.3d 943, 953 (4th Cir. 1995)).

In this case, according to the dictates of Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), the Court notified Prince of his right to respond to Defendants' Motion and advised that he may file affidavits, declarations, and exhibits along with his response. (See ECF No. 33). Prince did not submit a Rule 56(d) affidavit expressing a need for discovery with his Opposition Response.

**B.**   **Summary Judgment**

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a

party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing that there is a genuine dispute of material fact. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 140 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co., LLC v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citations omitted). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001). A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248.  If the nonmovant has failed to make a sufficient showing on an essential element of his case where he has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an

essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23 (1986).

**C.     <u>Analysis</u>**

Defendants move for dismissal of the Complaint because (1) Prince failed to exhaust administrative remedies properly before filing suit in this Court; (2) the Eleventh Amendment bars this suit against Defendants in their official capacity; (3) the Complaint fails to adequately allege supervisory liability against Warden Webb; (4) the Complaint fails to state an Eighth Amendment violation as to Officer Crabtree; and (5) Defendants are entitled to qualified immunity. (Mot. at 7–22).

**1.     Exhaustion of Administrative Remedies**

Defendants assert that Prince's claims are subject to dismissal under the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, because they have not been properly presented through the administrative remedy procedure. (<u>Id.</u> at 7). The PLRA provides in pertinent part that:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). The phrase "prison

conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002); see also Chase v. Peay, 286 F.Supp.2d 523, 527 (D.Md. 2003), aff'd, 98 F.App'x 253 (4th Cir. 2004).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading standard on the prisoner. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendants. See Jones v. Bock, 549 U.S. 199, 216 (2007). A claim that has not been exhausted may not be considered by this Court. See id. at 220. In other words, exhaustion is mandatory, and a court usually may not excuse an inmate's failure to exhaust. See Ross v. Blake, 578 U.S. 632, 638–40 (2016).

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. Moore v. Bennette, 517 F.3d 717, 725, 729 (4th Cir. 2008); see also Langford v. Couch, 50 F.Supp.2d 544, 548 (E.D.Va. 1999) ("The second PLRA amendment made clear that exhaustion is now mandatory."). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." Woodford v. Ngo, 548 U.S. 81, 88, 93 (2006). This requirement is one of "proper exhaustion of administrative remedies, which means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." Id. at 90 (emphasis in original) (internal quotation marks omitted) (quoting Pozo v. McCaughtry, 286 F.3d 1022, 1024 (7th Cir. 2002)). But the Court is "obligated to ensure that any defects in [administrative] exhaustion were not procured from

11

the action or inaction of prison officials." Aquilar-Avellaveda v. Terrell, 478 F.3d 1223, 1225 (10th Cir. 2007).

To pursue a grievance, a prisoner confined in a Maryland prison may file a grievance with the IGO against any Division of Correction ("DOC") official or employee. Md. Code Ann., Corr. Servs. § 10-206(a). However, to have a grievance approved by the IGO, the prisoner must first follow the institutional ARP process before filing a grievance with the IGO. Id. § 10-206(b). Inmates housed at an institution operated by the Department of Public Safety and Correctional Services ("DPSCS") may avail themselves of the administrative grievance process designed for inmate complaint resolution. See generally id. § 10-201 et seq.; Md. Code Regs. ("COMAR") 12.07.01.01B(1) (defining an ARP).

A prisoner in a DOC institution must file an ARP with their facility's managing official within thirty days of the date on which the incident occurred, or within thirty days of the date the prisoner first gained knowledge of the incident or injury giving rise to the complaint, whichever is later. COMAR 12.02.28.09(B). If the managing official denies the ARP, the prisoner has thirty days to file an appeal with the Commissioner of Correction. Id. 12.02.28.14(B)(5). If the Commissioner of Correction denies the appeal, the prisoner has thirty days to file a grievance with the IGO. Id. 12.02.28.18. The prisoner must include in the grievance copies of the initial request or administrative remedy, the Warden's response to that request, a copy of the ARP appeal filed with the Commissioner of Correction, and a copy of the Commissioner's response. Id. 12.07.01.04(B)(9)(a). If the grievance is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing. Md. Code Ann., Corr. Servs. § 10-207(b)(1); see also COMAR

12.07.01.07(B). An order of dismissal constitutes the final decision of DPSCS for purposes of judicial review. Md. Code Ann., Corr. Servs. § 10-207(b)(2)(ii). An inmate has not exhausted his administrative remedies until he has pursued his grievance through all levels. See Woodford, 548 U.S. at 90; see also Gibbs v. Bureau of Prisons, 986 F.Supp. 941, 943–44 (D.Md. 1997).

An inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a). In Ross v. Blake, 578 U.S. 632 (2016), the Supreme Court rejected a "freewheeling approach to exhaustion as inconsistent with the PLRA." Id. at 635. In particular, it rejected a "special circumstances" exception to the exhaustion requirement. Id. But, it reiterated that "[a] prisoner need not exhaust remedies if they are not 'available.'" Id. at 636. "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." Moore, 517 F.3d at 725.

The Supreme Court stated in Ross that an administrative remedy is available if it is "'capable of use' to obtain 'some relief for the action complained of.'" 578 U.S. at 642 (quoting Booth v. Churner, 532 U.S. 731, 738 (2001)). Thus, an inmate must complete the prison's internal appeals process, if possible, before bringing suit. See Chase, 286 F.Supp.2d at 529–30. As a prisoner, Prince is subject to the strict requirements of the exhaustion provisions. See Porter, 534 U.S. at 528 (making no distinction with respect to exhaustion requirement between suits alleging unconstitutional conditions and suits alleging unconstitutional conduct). Exhaustion is also required even though the relief sought is not attainable through resort to the administrative remedy procedure. See Booth, 532 U.S. at 741.

The <u>Ross</u> court outlined three circumstances when an administrative remedy is unavailable and an inmate's duty to exhaust available remedies "does not come into play." 578 U.S. at 643. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." <u>Id.</u> Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." <u>Id.</u> at 643–44. The third circumstance arises when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." <u>Id.</u> at 644.

Prince does not allege in his Opposition that he has not failed to exhaust administrative remedies; rather, he alleges that Warden Weber failed to investigate the ARP he filed when, in Prince's view, he allowed the ARP to be dismissed based on a lie that he was provided yellow rubber gloves. (Resp. Opp'n Def.'s Mot. ["Opp'n"] at 5, ECF No. 36). Prince claims that nobody was able to produce a video image of anyone at WCI using yellow rubber gloves. (<u>Id.</u>). He further claims that he never received the February 28, 2023, letter from Robin Woolford regarding the missing documents from his IGO appeal. (<u>Id.</u>). He states that Defendants have not provided the documents that Prince did file with his appeal. (<u>Id.</u> at 6).

The February 28, 2023, letter was the second letter sent to Prince. (<u>See</u> Feb. 28, 2023 Letter at 6). Prince does not explain why he could not comply with the first request to provide missing paperwork to the IGO. Rather, it appears that Prince abandoned the

process in favor of filing the instant lawsuit. (See Opp'n at 6 ("[T]he games of the grievance procedure is why outside party need to govern the grievance procedure.")). Construing Prince's pleadings in a light most favorable to him, the Court finds that there is a strong possibility that Prince was unaware that the documents he provided to the IGO in response to the first request were insufficient. The Court will therefore address the merits of Prince's claims.

### 2.      Eleventh Amendment

Under the Eleventh Amendment of the United States Constitution, a state, its agencies, and its departments are immune from citizen suits in federal court absent state consent or Congressional action. See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984). Claims against state employees acting in their official capacities are also subject to Eleventh Amendment immunity because a suit against the state actor is tantamount to a suit against the state itself. See Brandon v. Holt, 469 U.S. 464, 471–72 (1985). The State of Maryland has not waived such immunity for claims of constitutional violation brought under § 1983. See Pevia v. Hogan, 443 F.Supp.3d 612, 632 (D.Md. 2020). Defendants Webb and Crabtree are immune from suit for actions taken in their official capacities, and the constitutional claims asserted against them in their official capacities are likewise dismissed.

### 3.      Personal Participation

It is well established that the doctrine of respondeat superior does not apply in § 1983 claims. See Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004) (explaining that there is no respondeat superior liability under § 1983). Liability of supervisory officials

"is not based on ordinary principles of <u>respondeat superior</u>, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" <u>Baynard v. Malone</u>, 268 F.3d 228, 235 (4th Cir. 2001) (quoting <u>Slakan v. Porter</u>, 737 F.2d 368, 372 (4th Cir. 1984)). Thus, supervisory liability under § 1983 must be supported with evidence:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

<u>Shaw v. Stroud</u>, 13 F.3d 791, 799 (4th Cir. 1994) (cleaned up), <u>cert denied</u>, 513 U.S. 831 (1994).

Prince's claim against Warden Webb is based on the manner in which his ARP was handled and the fact that that Webb believed the assertion that Prince was given rubber gloves. (Statement of Claim at 1). The approval of an ARP response alone is not enough to impute subjective knowledge of a constitutional violation. Without subjective knowledge, a prison official is not liable. <u>Farmer v. Brennan</u>, 511 U.S. 825, 846 (1994); <u>see</u> <u>Johnson v. Quinones</u>, 145 F.3d 164, 168 (4th Cir. 1998). Denial of a plaintiff's ARP requests and appeals alone is "insufficient to establish personal participation in the alleged constitutional violations." <u>Whitington v. Ortiz</u>, 307 F.App'x 179, 193 (10th Cir. 2009); <u>see also</u> <u>Gallagher v. Shelton</u>, 587 F.3d 1063, 1069 (10th Cir. 2009) (allegation that warden

"rubber-stamped" grievances was not enough to establish personal participation), Lomholt v. Holder, 287 F.3d 683, 684 (8th Cir. 2002) (denial of grievances does not state a substantive constitutional claim). Prince's claim against Warden Weber must be dismissed.

### 4.    Eighth Amendment Claim

Prince's Eighth Amendment claim against Officer Crabtree also fails. The Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned." Iko v. Shreve, 535 F.3d 225, 238 (4th Cir. 2008). Conditions of confinement that "involve the wanton and unnecessary infliction of pain," or which "deprive inmates of the minimal civilized measure of life's necessities," may amount to cruel and unusual punishment. Rhodes v. Chapman, 452 U.S. 337, 347 (1981).

However, conditions that are merely restrictive or even harsh "are part of the penalty that criminal offenders pay for their offenses against society." Id. In order to establish the imposition of cruel and unusual punishment in conditions of confinement, a prisoner must prove two elements: that "'the deprivation of [a] basic human need was objectively sufficiently serious,' and that subjectively the officials act[ed] with a sufficiently culpable state of mind.'" Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995) (citation omitted). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called 'punishment,' and absent severity, such punishment cannot be called 'cruel and unusual.'" Iko, 535 F.3d at 238 (quoting Wilson v. Seiter, 501 U.S. 294, 298–300 (1991)).

The objective prong of a conditions claim requires the prisoner to "'produce evidence of a serious or significant physical or emotional injury resulting from the

challenged conditions,' or demonstrate a substantial risk of such serious harm resulting from the prisoner's unwilling exposure to the challenged conditions." Shakka, 71 F.3d at 166 (quoting Strickler v. Waters, 989 F.2d 1375, 1381 (4th Cir. 1993)).  Thus, "a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year" violates the Eighth Amendment, even if "the complaining inmate shows no serious current symptoms." Helling v. McKinney, 509 U.S. 25, 33–34 (1993); Webb v. Deboo, 423 F.App'x 299, 300 (4th Cir. 2011).

To establish a sufficiently culpable state of mind, there must be evidence of deliberate indifference, in that a known excessive risk of harm to the inmate's health or safety was disregarded. See Wilson, 501 U.S. at 302–03 (applying the deliberate indifference standard to conditions of confinement claims). "[T]he test is whether the guards know the plaintiff inmate faces a serious danger to his safety and they could avert the danger easily yet they fail to do so." Brown v. N.C. Dep't of Corr., 612 F.3d 720, 723 (4th Cir. 2010) (quoting Case v. Ahitow, 301 F.3d 605, 607 (7th Cir. 2002)).

Courts have repeatedly held that leaving a prisoner in a cell containing human waste is sufficiently dangerous to an inmate's health and safety as to satisfy the objective prong of this test. See Williams v. Griffin, 952 F.2d 820, 825 (4th Cir. 1991) (holding that overcrowded cells with sewage and urine, as well as insects and vermin, support an Eighth Amendment claim); Walker v. Schult, 717 F.3d 119, 126–27 (2d Cir. 2013) (holding that unsanitary cell conditions, including urine and feces on the floor, can constitute cruel and unusual punishment); Gates v. Cook, 376 F.3d 323, 338 (5th Cir. 2004) (affirming a finding of an Eighth Amendment violation based on filthy living conditions including fecal matter

and urine in cells); <u>McBride v. Deer</u>, 240 F.3d 1287, 1291–92 (10th Cir. 2001) (holding that three days in a feces-covered cell is a sufficient basis to state an Eighth Amendment claim); <u>Howard v. Adkison</u>, 887 F.2d 134, 137 (8th Cir. 1989); <u>see also</u> <u>Taylor v. Larson</u>, 505 F.App'x 475, 477 (6th Cir. 2012). "Not surprisingly, human waste has been considered particularly offensive so that 'courts have been especially cautious about condoning conditions that include an inmate's proximity to it.'" <u>McBride</u>, 240 F.3d at 1292 (citations and alterations omitted). Absent from this case, however, is any indication that Prince was forced to live, for any period of time beyond the time it took to clean the tier, in close proximity to human waste.

Nothing about the facts alleged in this case suggests that the effects of the drainage back-up were deliberately created and then ignored by Officer Crabtree, or any other correctional officer involved. Rather, there is evidence that there was a concerted effort to clean up the spillage as quickly and efficiently as possible. (<u>See</u> Events Log at 2). When it became clear that there was not an available maintenance crew member to address the problem, inmates were asked to volunteer. (<u>See</u> <u>id.</u>; ARP Rs. at 2, 4–7). Officer Crabtree's actions do not indicate a deliberate attempt to expose Prince, or any other inmate, to hazardous waste.

Further, the alleged failure to provide Prince with rubber gloves for the duration of the clean-up efforts did not result in a serious physical or emotional injury. <u>See</u> <u>Strickler</u> 989 F.2d at 1381–82 (conditions that might rise to the level of a constitutional violation if a serious physical or emotional injury resulted do not state an Eighth Amendment claim). Here, Prince merely speculates that he may, at some point in the future, develop an illness

as a result of his participation in the clean-up. (Suppl. Compl. at 5). His complaints of a headache and a rash on his foot do not amount to a serious physical injury. His demand for a blood test, which he received, established that he did not suffer any ill effects from working to clean the tier. (Id.). Accordingly, Officer Crabtree is entitled to summary judgment in his favor.

### III.   CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment, construed as a motion for summary judgment. (ECF No. 32). The Complaint must be dismissed as to Defendant Warden Wayne Webb and summary judgment is granted in favor of Defendant Officer A. Crabtree. A separate Order follows.

Entered this 3rd day of April, 2024.


_____/s/_____
George L. Russell, III
United States District Judge